Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3022 | **DATE** | 2/20/2002 |
| **CASE TITLE** | Delores Quinn vs. Belhaven Convalescent Center, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum and Order. For the foregoing reasons, defendant's motion for summary judgment is granted and summary judgment is granted to defendant on all counts. (24-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | FEB 21 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 39 |
| ✓ | Mail AO 450 form. | | IS docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | TP | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DELORES QUINN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. 00 C 3022 |
| v. | ) |
| | ) Judge John A. Nordberg |
| BELHAVEN CONVALESCENT | ) |
| CENTER, INC., | ) |
| | ) |
| Defendant. | ) |

DOCKETED FEB 2 1 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff alleges that she was fired from her job because of her race. Her employer has filed a motion for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

Defendant Belhaven Convalescent Center, Inc. ("Belhaven") is a skilled care nursing home located in Chicago that provides care to chronically ill, handicapped, and elderly residents. Plaintiff was hired by Belhaven in March 1997 and worked there as a certified nurse's aid ("CNA") until July 3, 1998, when both she and her immediate supervisor were fired for getting into a loud argument outside the rooms of several elderly residents. Plaintiff, who is African American, asserts that her supervisor, who is white, started the argument by rudely ordering her to attend to a resident and escalated it by using inflammatory and racist language including the words "nigger" and "bitch." Plaintiff says that she merely responded as best she could under

-1-

39

these trying circumstances and that her supervisor is the one at fault. Believing that she did nothing wrong, plaintiff has concluded that her firing was a case of race discrimination.

The argument took place around 6:30 a.m. on the morning of June 28, 1998. It began near the second floor nurse's station and continued for approximately 20 to 30 minutes as the two women moved down the hall to attend to the residents. Although several employees and residents witnessed parts of the argument, it does not appear that one person saw the entire encounter from start to finish, and there are some disputed factual issues as to exactly what happened. Many of these witnesses later testified at a hearing on plaintiff's labor arbitration grievance.

Plaintiff's immediate supervisor, Imelda Bennett, was finishing up her night shift. Plaintiff was beginning her day shift and was in the process of writing down her room assignments.[1] Bennett asked plaintiff if she would take one of the elderly residents (Loraine Shroeder) to the bathroom. Plaintiff replied that she would do it after she finished writing down her room assignments. Bennett became upset at what she believed was plaintiff's refusal to obey a direct order and insisted that plaintiff attend to the resident immediately. According to plaintiff, Bennett used a loud voice and said "I want you to take her now. God damn it I'm asking you to do it now." (Arb. Tr. at 136.) Plaintiff claims that she walked away and asked Shroeder whether she needed to use the bathroom and Shroeder said no.

After this initial exchange, the two women became upset and argued back and forth over the next twenty minutes or so. For purposes of the present motion, we need not set forth every

---

[1] Bennett is a registered nurse ("RN") and had supervisory responsibility over plaintiff and the other CNA's on her floor.

-2-

alleged statement and accusation. Plaintiff generally alleges that Bennett called her a "nigger" and a "bitch" several times. At one point, according to plaintiff, Bennett said to one of the residents while plaintiff was in the same room: "These niggers are taking over. If you let them they will take over." (*Id.* at 143.) At another point, again according to plaintiff, Bennett noticed that one of the residents had a black eye and insinuated plaintiff was responsible when in fact she had no involvement with the resident. This accusation upset plaintiff: "When she said that to me, I said, 'Hey, I can't take this shit no more.'" (*Id.* at 144.)

Twice during the encounter, plaintiff left and went down to the first floor to get help from the night supervisor, Alma Facullo, who told plaintiff that she would come check into the situation as soon as she finished with another matter.

After the argument ended, Facullo paged Mary Rose Stucker, who is the hospital administrator in charge of employee discipline. Stucker, who was not at work, told Facullo to send both women home and to get statements from any witnesses. When Stucker returned to work on July 1st, she conducted an investigation into the incident. She read the statements that had been taken on the 28th, which included plaintiff's statement, and also interviewed three of the residents who were on the floor during the incident.

Stucker concluded that both nurses should be terminated for their behavior during the argument. The official reason listed on the Employee Disciplinary Form is verbal or physical abuse of other employees. This language comes directly from the employee handbook (entitled "WELCOME!"), which lists "verbal or physical abuse of other employees" as one of several infractions that subjects the offender to immediate termination. In her arbitration testimony, Stucker described her decision at greater length and how she came to it.

She first concluded that there was no evidence that either of the women ever physically assaulted the other. Bennett had made such an allegation against plaintiff, but Stucker found no evidence to support it. Stucker also rejected the allegation that plaintiff had disobeyed a direct order from her supervisor when she failed to immediately take Shroeder to the bathroom.

Stucker placed great weight on the fact that the two women got into a shouting match involving profanity in front of several residents. *See Id.* at 68 ("They're two professional women, and to subject the residents to that type of behavior and language was unexcusable and called for termination."). The residents who heard the argument had been upset by it. For example, Loraine Shroeder said that she was "frightened" by the incident. Stucker suggested that, if the dispute had not taken place in front of the residents, plaintiff probably would have received a punishment short of termination. Stucker also investigated whether Bennett in fact had used the word "nigger" but was unable to come to any firm conclusion. When asked who started the argument, Stucker said that she made no determination because this fact would not have made any difference in her decision:

> We're supposed to be there to be taking care of residents. I expect professionalism. And there is a lot of things that you have to be able to rise above with the residents that you should be able to control your emotions and behavior.

(*Id.* at 82-83.)

After she was fired, plaintiff filed a labor grievance asserting that she was wrongfully terminated. An arbitration hearing was held on July 11 and 24, 2000. In a written opinion dated October 2, 2000, the arbitrator concluded that plaintiff did not commit insubordination for failing to immediately take Shroeder to the bathroom but he did conclude that both plaintiff and Bennett had used "foul language in the proximity of nursing home residents" and that this action justified

-4-

some discipline. (Arb. Op. at 15.) However, the arbitrator concluded that termination was "just too severe" a penalty given that Bennett had provoked plaintiff and given that plaintiff "was doing the right thing" by trying to get help from Facullo. (*Id.* at 17.) He therefore ordered that plaintiff be reinstated with full seniority and back pay starting from December 2, 1998, effectively giving her a five-month suspension for her role in the argument. (*Id.*)[2]

Plaintiff then filed a charge with the EEOC and the Illinois Department of Human Rights ("IDHR"). The IDHR investigated the charge and concluded that there was no evidence of discrimination. The IDHR General Counsel sustained the dismissal of plaintiff's claims. The EEOC issued a right-to-sue letter on February 17, 2000. Three months later, on May 17, 2000, plaintiff filed a *pro se* complaint. We subsequently appointed counsel to represent plaintiff. Counsel conducted additional discovery and filed an amended complaint.

## **DISCUSSION**

Plaintiff is bringing a claim under Title VII, alleging that the company fired her in an act of intentional race discrimination. She also alleges that the company fired her in retaliation for previous complaints she made about co-workers using racist language sometime earlier in 1998.[3]

A plaintiff asserting a Title VII claim may proceed either by presenting direct evidence of discrimination or by utilizing the indirect burden-shifting method under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It is undisputed that plaintiff has no evidence of direct

---

[2]The arbitrator said that he could not reliably confirm whether or not Bennett had ever used the word "nigger." (Arb. Op. at 16.)

[3]Plaintiff also appears to be asserting a claim under 42 U.S.C. § 1981 and a pendent state law claim under the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*. The parties agree that both these claims depend on the same analysis and methods of proof as the Title VII claim and therefore will stand or fall with that claim.

-5-

discrimination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus."). She is therefore proceeding under the *McDonell Douglas* framework.

As summarized by the Seventh Circuit, this well-known three-part framework is as follows:

> Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case of discrimination. A plaintiff establishes a prima facie case of discrimination by demonstrating that: (1) he belongs to a protected class, (2) he performed his job according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably by the defendant. Once the plaintiff has established his prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a legitimate, non-discriminatory reason for discharging plaintiff. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the defendant's stated reason for the adverse action was a pretext for discrimination. If the plaintiff meets his respective burdens under *McDonnell Douglas*, summary judgment is inappropriate; a plaintiff need not come forward with direct evidence of discrimination in order to survive summary judgment.

*Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001) (citations and footnotes omitted).

Defendant argues that plaintiff has not met the second and fourth factors needed to make out a *prima facie* case.[4] First, she has cannot show that she was performing her job adequately because she has effectively admitted in her arbitration testimony that she violated the company rule prohibiting verbal abuse of a co-worker. Second, she has not pointed to any similarly situated person who is not black and who was treated more favorably. Defendant next argues that, even if plaintiff somehow could establish a prima facie case, she still cannot show that the

---

[4]The parties agree that the first and third factors are satisfied. Plaintiff is an African American and she was fired from her job.

defendant's proffered reason for firing her was pretextual. This latter question of pretext is often intertwined with the earlier prima facie question of whether plaintiff was performing up to her employer's legitimate expectations. *See id.* at 886.

Before analyzing this latter question, we will first address the question of whether plaintiff has presented evidence of a similarly situated individual. The simple answer is that she has not. The only alleged comparable individual specifically identified by plaintiff is Bennett. As defendant correctly argues, however, the fact that Bennett was also fired from her job undercuts any argument that she received favorable treatment. This is not a situation where the company overlooked an employee's behavior or gave her a slap on the wrist. Bennett was given the ultimate punishment in the employment context – termination.

In her response brief, plaintiff does not attempt to rebut this argument. Instead she narrows her focus and argues that, although Bennett may have received the same ultimate punishment, Bennett was treated more favorably because she was not suspended during the brief period (less than a week) in which the investigation was being conducted. This argument simply does not hold up under the undisputed facts. It is undisputed that Stucker ordered that both women be suspended on June 28th pending the outcome of the investigation. Plaintiff alleges that, despite this initial order, Bennett returned to work from either one to five days, depending on whose testimony is believed. This point is immaterial because Stucker never gave permission for Bennett to return to work and when she learned that Bennett had returned, she immediately ordered that she be sent home.

Plaintiff makes one other brief attempt to meet this requirement. As described more fully below in the discussion on the retaliation claim, she claims that some unnamed white and Asian

-7-

RN's on occasion referred to CNA's (including plaintiff) as "niggers." She further claims that these RN's were never disciplined for their behavior. This argument fails because plaintiff has not provided any specific information to allow for a meaningful comparison. Of critical importance, plaintiff has not even identified these individuals by name nor has she provided any specific dates. Without any names, it is impossible to determine whether these individuals were disciplined for their behavior.[5] Plaintiff also has not stated where the comments were made, in what tone of voice they were made, and whether they were made as part of an extended argument. The details are important for any comparison because Stucker placed great weight on the fact that the argument between plaintiff and Bennett took place in front of several residents who were disturbed by the incident. While we obviously do not wish to condone any use of racist language, these vague allegations do not satisfy the similarly situated requirement.

Even if plaintiff could meet the similarly situated requirement, we would still find that judgment should be granted for the defendant because plaintiff has not shown that the stated reason for her firing was a pretext. The Seventh Circuit has summarized the principles governing the pretext inquiry many times. The following summary, again from the Seventh Circuit's decision in *Gordon*, provides a good overview:

> To show pretext, [plaintiff] bears the burden of demonstrating that [the employer's] ostensible justification for its decision is unworthy of credence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998); *see also Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999) (stating that a plaintiff can show pretext "by showing that the employer's proffered reason was not worthy of belief"), *cert. denied*, 528 U.S.

---

[5]Plaintiff says she never heard of anyone being disciplined for such behavior. Even if true, it is not clear that plaintiff would have been in a position to know about all of the company's disciplinary actions.

-8-

1173, 120 S.Ct. 1201, 145 L.Ed.2d 1104 (2000). [Plaintiff] may make the requisite showing by providing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Adreani*, 154 F.3d at 395 (internal quotation marks and citations omitted); *see also Sanchez*, 188 F.3d at 746.

If [the employer] honestly believed its reason for discharging [plaintiff], [plaintiff] cannot meet his burden. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 453 (7th Cir. 1999). This is true even if [the employer's] reason for [plaintiff's] discharge was "foolish or trivial or baseless"; as long as [the employer] honestly believed its reason, then summary judgment for [the employer] is appropriate. *Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir. 1997); *see also Crim v. Board of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998) (explaining that it is not enough for the plaintiff to prove that the employer's reason was doubtful or mistaken). Title VII sanctions employers who discriminate, not those who are simply inept or incompetent.

Our cases have warned, repeatedly, that we do not sit as a superpersonnel department that will second guess an employer's business decision. *See Stewart*, 207 F.3d at 378. However, we need not abandon good reason and common sense in assessing an employer's actions. Indeed, we have stated that a "determination of whether a belief is honest is often conflated with analysis of reasonableness." *Flores v. Preferred Technical Group*, 182 F.3d 512, 516 (7th Cir. 1999); "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held," *id.* Our cases therefore have acknowledged that we need not take an employer at its word. For instance, we have held that when an employee provides "[a] detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994). Furthermore, "[i]f the employee offers specific evidence from which the trier of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Dey*, 28 F.3d at 1461. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation . . . ." *Adreani*, 154 F.3d at 395 (citations omitted).

246 F.3d at 888-89.

As the above quotation makes clear, as long as the employer's stated reason is sincere and honest, then it does not matter if a jury might think the decision was "foolish" or "trivial" or "mistaken." At the same time, as the above quotation also indicates, it is possible to argue that an employer's stated reason was so objectively unreasonable that a jury could draw an inference that it was a pretext for discrimination. Plaintiff relies on this latter method. As set forth below, even when the facts are construed in her favor, plaintiff has not brought forth the type of "detailed refutation" needed to establish pretext.

We begin with some contextual facts. First, there is no evidence that Stucker harbored any bias against blacks or had any larger agenda to try to get rid of black employees. Second, it is undisputed that approximately 98% of the CNA's at Belhaven at this time were black and that plaintiff's job was subsequently filled by another African-American.[6] Third, there is no evidence to suggest that Stucker's investigation was shoddy or superficial. By all accounts, Stucker conducted a thorough and responsible investigation and reviewed all the available evidence. She read the witness statements taken on the day of the incident and interviewed additional witnesses. She also rejected several of the allegations originally made against plaintiff.[7]

With these facts in mind, we now turn plaintiff's argument that Stucker's decision was incorrect. Plaintiff first suggests that Stucker got the facts wrong when she concluded that plaintiff verbally abused Bennett. Although plaintiff concedes that she used the word "bitch" and

---

[6]Plaintiff worked on a rotating basis and therefore, technically, her job was not replaced by one single individual. However, defendant states – and plaintiff does not dispute – that the next 51 individuals hired for the position of CNA following plaintiff's termination were all African Americans.

[7]It is undisputed that Stucker had the sole authority to fire the two women and that she made the final decision by herself.

"shit," she claims that she never used these words to refer to Bennett and therefore argues that she did not use profanity in a "verbally abusive" manner.[8] She relies on her own testimony and that of Carolyn Byles to establish this point. Plaintiff also argues that she was not yelling or shouting at Bennett. She admits that she may have used a loud voice but argues that she always "talks loud," thus suggesting that she was not using a loud voice in an effort to verbally abuse Bennett. In a broader argument, plaintiff claims that Bennett is the true wrongdoer. She instigated the argument, she used racist language, and she made false accusations of misconduct. In effect, plaintiff is claiming that, if she did raise her voice or use profanity, she did so in an understandable reaction to Bennett's provocative behavior.

These arguments are not enough to avoid summary judgment. With regard to the factual questions, even if plaintiff can point to certain witnesses to support her version of the facts, it is clear that there are a number of witnesses that support Stucker's conclusion that plaintiff was swearing and shouting at Bennett. For example, one resident (Clifford Kolze) confirmed that the two women "were swearing back and forth" outside his room. (Arb. Tr. at 54.) Another witness, Victoria Irons, said that both woman were "calling each other bitches and motherfuckers." (6/30/98 Statement.) Yet another witness, Gwendolyn Johnson, stated that both women "got louder" as they moved down the hall, "were cursing and screaming at each other," and "were calling each other bitches and motherfuckers." (Arb. Tr. at 20.) These witnesses clearly show that Stucker had some objective support in the record for her decision and that it was not "factually baseless" – a point that is reinforced by the fact that the arbitrator likewise concluded

---

[8]As an example of how she used profanity, plaintiff cited to the following example: "[Bennett] called me a bitch. And I told her [to] put a handle on it. If you're going to call me a bitch, I'm a super bitch and I don't play your games." (Arb. Tr. at 160-61.)

-11-

that plaintiff used "foul language" in front of the residents.

Plaintiff's argument that she never used profanity to specifically refer to Bennett does not undermine the company's rationale. Even if true, the undisputed facts still remain – plaintiff got into a loud argument involving profanity in front of several residents. In her explanation of why plaintiff was fired, Stucker never indicated that she rested her conclusion on the fact that plaintiff swore *at* Bennett instead of simply swearing generally.

With regard to plaintiff's claim that Bennett started the argument, this argument again overlooks the stated rationale for her firing. Stucker testified that, regardless of who started the argument, both women should have "control[led] [their] emotions and behavior" and acted in a professional manner. In other words, even if Bennett did make outrageous statements, plaintiff should have maintained her cool and should not have been drawn into an extended shouting match. Again, there is no evidence that Stucker did not believe in this rationale. Even if a jury ultimately could disagree with Stucker's decision, it could not reasonably say that her decision was so objectively off base to suggest that it was a pretext for race discrimination.

We now turn to the retaliation claim, which was not an issue developed in the labor arbitration. Relying on recently submitted affidavits, plaintiff alleges that Belhaven fired her in retaliation for the fact that she complained earlier in the year that some white and Asian RN's referred to plaintiff and certain other CNA's as "niggers" on occasion. Plaintiff says that she complained "on several occasions" to Roxanne Taylor, who is the CNA supervisor.

Plaintiff has no direct evidence that her firing was based on this retaliatory motive. Therefore, in order "to establish a prima facie case of retaliatory discharge, she must show (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse action

subsequent to this activity; and (3) that there was a causal link between the protected activity and the adverse action." *Lewis v. Holsum of Fort Wayne, Inc.*, 2002 WL 101101, *3 (7th Cir. Jan. 28, 2002).

Although suspicious about the allegation, the defendant is willing to accept for purposes of summary judgment that plaintiff in fact complained to Taylor about her co-workers' use of racist language, thus satisfying the first factor of the prima facie case. It is undisputed that plaintiff later was fired. Defendant asserts, however, that there is no evidence of a causal link between the alleged complaints and the subsequent firing. We agree.

First, there is a gap in timing. Plaintiff is vague as to the exact dates that she made her complaints but states in her affidavit that she complained "on several occasions" to Taylor at monthly meetings in the "spring of 1998." She was fired on July 3, 1998. Although what is meant by "spring" is not clear, it would be reasonable to assume that there was a gap between the complaints she made and her firing of a month at the very least and probably even reasonable to assume that the gap was two months. This length of time, although not conclusive by itself, raises serious doubts about the causal link. *See, e.g., EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) ("we agree with the district court that the temporal proximity of [plaintiff's] termination with his filing of an EEOC charge (some six weeks) is insufficient to establish retaliation.").

Second, in addition to this timing gap, plaintiff's claim suffers from the fact that there is no evidence that Stucker was ever made aware of the alleged complaints made by plaintiff. *See Alexander v. Wisc. Dept. of Health and Family Servs.*, 263 F.3d 673, 688 (7th Cir. 2001) ("Although the timing of an adverse employment action can be evidence of an act of retaliation,

[plaintiff's] inability to provide 'evidence that any of the actors involved in his suspension [] had any knowledge of his complaint before his suspension,' prevents any such inference to be drawn from the timing of his suspension and eventual termination.") (citations omitted). In her deposition, Stucker stated that she had never heard about any such complaints. Plaintiff has not come forward with any other indirect evidence suggesting Stucker was told about them. Plaintiff apparently did not make any written complaints. For all we know, Taylor simply handled the complaints herself and never told Stucker about them. Without some evidence to the contrary, we cannot speculate that Stucker was aware of them. If Stucker did not know about the complaints, then her decision to fire plaintiff could not have been motivated by any desire to retaliate, and plaintiff's retaliation claim fails.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and summary judgment is granted to defendant on all counts.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Court Judge

**DATED:** February 20, 2002